**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| KELVIN GARCIA,<br>       Plaintiff<br>   v.<br>DISTRICT OF COLUMBIA,<br>       Defendant. | Civil Action No. 22-1487 (CKK) |

**MEMORANDUM OPINION**
(March 14, 2024)

Plaintiff Kelvin Garcia, a Hispanic male, alleges that Defendant District of Columbia ("District of Columbia" or "District") terminated his employment as a District of Columbia Metropolitan Police Department ("MPD") officer after taking a promotional exam because of racial animus against Hispanic officers. *See generally* [26] Third Amended Complaint ("Compl.") at 1–2. Now pending before the Court is Defendant's [27] Motion to Dismiss Count One of the Complaint, in which they argue that Plaintiff has failed to plausibly allege municipal liability as is required. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court **DENIES** Defendant's [27] Motion to Dismiss.

**I. BACKGROUND**

The Court herein recites only those allegations necessary for the resolution of the issue presented by the pending partial Motion to Dismiss. Additionally, at this stage, the Court accepts

---

[1] The Court's consideration has focused on the following documents:
- Def.'s Mot. to Dismiss Count I of the Complaint ("Def.'s Mot."), ECF No. 27;
- Pl.'s Mem. in Opp'n to Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 30; and
- Def.'s Reply in Support of Mot. to Dismiss ("Def.'s Reply"), ECF No. 31.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

1

as true the well-pleaded allegations in Plaintiff's Complaint.

### A. The Underlying Offense Giving Rise to Plaintiff's Termination

Plaintiff Kelvin Garcia is an Afro-Latino male who was an MPD officer. Compl. ¶¶ 1, 4. In September 2017, he sat for the MPD Seargant's promotional exam alongside approximately 800 officers. *Id.* ¶¶ 4–5. He was seated at a table with one other officer, who was white, approximately four to six feet away. *Id.* ¶ 6. Halfway through the exam, one of the proctors tapped Plaintiff and the other officer on the shoulder and told them to split apart. *Id.* ¶ 9. Plaintiff was disrupted and distracted, but quickly complied and returned to work on the exam. *Id.* ¶ 10. Approximately ten minutes later, the proctor returned and told Plaintiff to move his seat to a table by himself. *Id.* ¶ 11. Plaintiff's concentration was badly destabilized, but he finished the exam nevertheless. *Id.* ¶¶ 11–12.

Afterwards, the proctor emailed the testing vendor and asked them to look up Plaintiff's results, but not those of the officer next to him. *Id.* ¶ 13. The testing vendor provided the proctor Plaintiff's test on or about September 30, 2017 and concluded that Plaintiff had been cheating off the other officer. *Id.*; *see also* Compl. at 2. On or about October 12, 2017, Plaintiff was notified that the MPD's Internal Affairs Division ("IAD") was going to recommend him for termination. *Id.* ¶ 14.

### B. MPD Processes Leading to Plaintiff's Termination

At MPD, the IAD's recommendations first go to the Chief of Police, who decides whether to send the accused officer to a "trial board." *Id.* at ¶¶ 14–15. It can take a long time for the trial board to be convened and hold proceedings, as typically both MPD management and the accused take time to build their case and gather evidence. *Id.* ¶ 20. The trial board then conducts a hearing and determines the next steps, including any discipline. *Id.* ¶ 16. Appointments to the

trial board are made by the Chief of Police; board members who displease the Chief of Police in their decisions are asked not to serve again. *Id.* ¶ 17. The trial board does not always uphold the recommendation of the IAD; many officers who have been recommended for termination have had such recommendations rejected by the trial board. *Id.* ¶ 19. The Chief of Police can choose not to follow the trial board's decision and, for example, keep an officer employed over the board's recommendation to terminate. *Id.* ¶ 21. Both before and after the board's proceedings, the Fraternal Order of Police ("Union") often negotiates with management, including the Chief of Police, to reduce discipline. *Id.* ¶¶ 18, 21.

In this case, the IAD recommended Plaintiff's termination in October 2017. *Id.* ¶ 14. Their recommendation went to the then-Chief of Police, Peter Newsham, who sent it to the trial board. *Id.* ¶ 45. Plaintiff's trial board took place in early 2019. *Id.* ¶ 22. The board did not render judgment until March 2019, during which time he remained employed at MPD. *Id.* Because termination was such an extremely harsh disciplinary action for his alleged transgression, Plaintiff believed that negotiations between the Union and the Chief of Police would result in a reduction of his discipline to a suspension. *Id.* ¶ 23.

Nevertheless, Plaintiff took various steps challenging this determination, including filing a grievance of the termination. *Id.* ¶ 25. Many officers who are terminated by the trial board have their terminations reversed—or their discipline otherwise reduced—through the grievance process, during which the accused participates in an arbitration hearing led by a neutral arbitrator selected by both the Union and MPD management. *Id.* ¶¶ 26–28. In November 2020, Plaintiff received an arbitration decision upholding MPD's decision to terminate him. *Id.* ¶ 29.

Plaintiff also filed an internal EEO complaint and EEOC charge after receiving the initial decision of the trial board. *Id.* ¶¶ 31–32. In these filings, Plaintiff asserted that he was targeted

for scrutiny during the exam and treated disparately because he was Hispanic, and that other officers who were previously suspected of cheating were not recommended for termination. *Id.* ¶ 33–34.

### C. Plaintiff's Allegations of Discrimination

Plaintiff alleges that MPD has a history of giving excessive disciplinary discretion to white managers and leaders and allowing them to use that discretion to harm minorities, especially Hispanic officers. *Id.* ¶ 36. Many Hispanic officers have complained about this to MPD leadership but have been ignored. *Id.* ¶ 37.

In this case, Plaintiff raised concerns with management that he was being singled out for excessive discipline, but he was ignored and discredited. *Id.* ¶ 38. Termination is not the common consequence for cheating on a promotional exam. *Id.* ¶ 40. In the past, two non-Hispanic officers were caught cheating in promotional exams and neither was terminated (Dianne Groomes, white female, 2010; and Ernest Cole, Black male, 2016). *Id.* ¶¶ 35, 39.

Plaintiff also alleges that MPD has a history of allowing Chiefs of Police to make employment decisions based on discretion, and the Chiefs have exercised their discretion in a manner that is harmful to Hispanic officers. *Id.* ¶ 41. Officers of color are referred by the Chief of Police to the trial board for disciplinary action at a disproportionately high rate compared to white officers. *Id.* ¶¶ 15, 44. That the Chief of Police appoints members to the trial board then influences the outcomes of the boards. *Id.* ¶ 43. Peter Newsham, the Chief of Police at the time of Plaintiff's disciplinary action, had a history and pattern and practice of disproportionately harsh disciplinary treatment of Latino officers. *Id.* ¶ 45.

In June 2018, a Latino male officer, Officer Hiram Rosario, was sent to the trial board by Chief Newsham after a recommendation of termination by the IAD for allegedly hitting a

gay/transgender person. *Id.* ¶ 46.  Most officers accused of such behavior are not recommended for termination unless they have previous disciplinary action in their employment history; Officer Rosario did not have such previous disciplinary history, but he was nevertheless recommended for termination. *Id.* ¶ 47.  The trial board found him not guilty of assault but recommended demotion, which Chief Newsham approved. *Id.* ¶ 48.  Officer Rosario filed a complaint against Chief Newsham alleging, among other things, that the disciplinary action against him was motivated by anti-Latino animus. *Id.* ¶ 49.  Officer Rosario filed a grievance to challenge his demotion and prevailed at arbitration, at which time the neutral arbiter concluded that the demotion was overly harsh and disparate punishment. *Id.* ¶¶ 50–51.

**D. Procedural History**

Plaintiff filed the present action in May 2022 and his Third Amended Complaint in March 2023, bringing three counts: Count One, alleging a violation of 42 U.S.C. § 1981, enforced via § 1983, for discrimination based on race and ethnicity; Count Two, alleging a violation of Title VII of the Civil Rights Act of 1967 for disparate treatment based on race and ethnicity; and Count Three, alleging a violation of the D.C. Human Rights Act for disparate treatment based on race and ethnicity.  Compl. at 10–14.

Defendant District of Columbia filed the pending Motion to Dismiss Count One under Federal Rule of Civil Procedure 12(b)(6). *See generally* Def.'s Mot.  That Motion is now fully briefed and ripe for the Court's review.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The Federal Rules of Civil Procedure require that a complaint contain "'a

short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the… claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).  Rather, a complaint must contain sufficient *factual* allegations that, if true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must construe the complaint in the light most favorable to the plaintiff and accept as true all reasonable factual inferences drawn from well-pleaded factual allegations.  *See In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994) (TFH).

## III. DISCUSSION

In Count One, Plaintiff alleges a violation of 42 U.S.C. § 1981, enforced via § 1983, for discrimination based on race and ethnicity.  Defendant argues that the Court should dismiss Count One because Plaintiff fails to plausibly allege the District's municipal liability as required under Section 1983.  The Court finds that Plaintiff has sufficiently alleged municipal liability at this stage to survive a motion to dismiss.

### A. Undisputed Elements of Sections 1981 and 1983

To establish a Section 1981 violation, a plaintiff must "identify an impaired 'contractual relationship,' under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (citing 42 U.S.C. § 1981(b)).  Plaintiff was in a contractual employment

relationship with MPD as an employee, Pl.'s Opp'n at 5; *Dickerson v. District of Columbia*, 315 F. Supp. 3d 446, 453 (D.D.C. 2018) (PLF), which Defendant does not contest, *see* Def.'s Mot. at 4 (not addressing this issue).

When a Section 1981 claim is brought against a municipality, as it is here, a plaintiff must pursue their remedy through Section 1983. *Dickerson*, 315 F. Supp. 3d at 451. Under that section, a municipality is only liable if the plaintiff satisfies a two-part inquiry: first, the complaint must state "a claim for a predicate constitutional violation," and second, "a claim that a custom or policy of the municipality caused the violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citations omitted); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978).

Defendant does not challenge the first element regarding Plaintiff's alleged constitutional violation. *See* Def.'s Mot. at 5 (not addressing this issue). Instead, Defendant focuses on the second part of the inquiry.

### B. Municipal Liability Under Section 1983

To satisfy the second element of Section 1983 outlined above, a plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). This, too, can be separated into two elements: first, the existence of a policy or custom; and second, causation. Defendant questions both, which the Court will now address in turn. *See* Def.'s Mot. at 6 (arguing that "Plaintiff's allegations do not establish a pervasive policy or custom" and that he does not present "facts showing that a municipal custom or policy was the moving force behind his termination").

### 1. Policy or Custom

A single instance of unconstitutional activity, without more, is likely insufficient to show a policy or custom. *See Hamilton v. District of Columbia*, 720 F. Supp. 2d 102, 113 (D.D.C. 2010) (JDB). But a plaintiff can show the existence of municipal policy or custom in various ways, including where the unconstitutional discrimination could be "so widespread as to constitute a custom, practice or policy," *Reed v. Dist. of Columbia*, 474 F. Supp. 2d 163, 168 (D.D.C. 2007) (RMC); *see also Monell v Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 690–94 (1978) (explaining that a practice need not be "authorized by written law," but may be "so permanent and well settled as to constitute a 'custom or usage' with the force of law"); through "the action of a policy maker within the government," *Baker*, 326 F.3d at 1306; or where "a policymaker [] knowingly ignore[s] a practice that was consistent enough to constitute custom," *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).

The Court finds that Plaintiff has satisfactorily alleged a municipal policy or custom at this stage. Although not a model of clarity, Plaintiff's Complaint and opposition brief set forth the allegation that MPD Chiefs of Police, including Chief Newsham, make discretionary employment and disciplinary decisions that are disproportionately harsher on Hispanic officers. *See, e.g.*, Pl.'s Opp'n at 6 (stating that "Plaintiff [] asserts extensive patterns of ongoing management behaviors that are discriminatory in nature" and referencing actions taken by the Chief of Police). Additionally, through their oversight and participation in the entire disciplinary process, the Chiefs of Police are "aware of disparate and harsher disciplinary treatment of [Hispanic officers] at MPD" by others involved in the process and opt not to quell this behavior. *Id.* at 7–8; *see also id.* at 9 ("[F]or all intents and purposes, Plaintiff's Section 1981 via 1983 claim, rises and falls on the extent to which Plaintiff can establish that the Chief of Police was

aware of, and condoned the deep-seated and consistent race discrimination at MPD.").

It is undisputed that the Chief of Police is the final municipal policymaker as to the MPD. *Sanders v. District of Columbia*, 85 F. Supp. 3d 523, 530–31 (D.D.C. 2015) (PLF).

Plaintiff offers the following facts to support his allegations establishing a municipal policy: the "longstanding" fact that officers of color are referred by the Chief of Police to the trial board for disciplinary action at a disproportionately high rate compared to white officers, Compl. ¶¶ 15, 44; the fact that the Chief of Police appoints and influences the trial board members in their decision-making, *id.* ¶¶ 17, 43; the fact that the Chief of Police sometimes negotiates with the Union prior to the trial board convening to reduce charges, *id.* ¶ 18; *see also* Pl.'s Opp'n at 6; the fact that two non-Hispanic officers were caught cheating in promotional exams and neither was terminated, but Plaintiff, a Hispanic man, was terminated, Compl. ¶¶ 35, 39; the fact that many Hispanic officers have complained to MPD leadership about the disparate discipline they have experienced, *id.* ¶ 37; the fact that Chief Newsham sent a Hispanic male officer, Officer Rosario, to the trial board for his actions that would not normally warrant such discipline, *id.* ¶¶ 46–47; and the fact that Officer Rosario filed a complaint against Chief Newsham alleging that the disciplinary action against him was motivated by anti-Latino animus, *id.* ¶ 49; in addition to the facts of his own case.

Defendant argues that Plaintiff makes only "bald assertion[s]" and "conclusory allegations," Def.'s Mot. at 6–7, but the Court disagrees. The Court does acknowledge that Plaintiff's factual support is far from manifold, and the comparison to Officer Rosario is less than perfect. *See* Def.'s Reply at 2 (explaining that the officer "was disciplined for conduct and on findings entirely distinguishable from Plaintiff's"). However, as enumerated above, Plaintiff does provide factual bases for his allegations, which, if liberally construed as the Court is

required to do at the motion to dismiss stage, adequately pleads that there was a municipal policy or custom. *See Baker*, 326 F.3d at 1306 ("if a complaint alleging municipal liability under § 1983 may be read in a way that can support a claim for relief, thereby giving the defendant fair notice of the claim, that is sufficient"); *compare Hamilton v. District of Columbia*, 720 F. Supp. 2d 102, 113 (D.D.C. 2010) (JDB), *with Plater v. District of Columbia Dept. of Transp.*, 530 F. Supp. 2d 101 (D.D.C. 2008) (ESH) (dismissing plaintiff's claim where she "alleges *no* facts to support her claim") (emphasis in original); *Jackson v. District of Columbia*, 949 F. Supp. 2d 257, 261 (D.D.C. 2013) (CKK) (dismissing plaintiff's claim where "the Complaint offers no factual allegations as to what policy, rule, practice or custom cause the violation of his constitutional rights"); *Sheikh v. District of Columbia*, 77 F. Supp. 3d 73, 85 (D.D.C. 2015) (CKK) (dismissing plaintiff's claim where plaintiff included "no more than a conclusory recital of the elements of a claim pursuant to *Monell*, together with the alleged predicate constitutional violations").

In sum, the Court finds that Plaintiff has sufficiently pleaded a municipal policy or custom: that the Chief of Police gave disproportionately harsher disciplinary decisions to Hispanic officers and/or was aware of others in the process generating disproportionately harsher disciplinary decisions for Hispanic officers.[2]

---

[2] To the extent that Plaintiff sought to establish some other municipal policy through another theory, the Court finds that this fails.  Plaintiff argues that he "crosses the [] hurdle" of showing municipal liability "by asserting [] specific EEO policies."  Pl.'s Opp'n at 6.  The Court cannot identify any such assertions in Plaintiff's Complaint; the closest language the Court could identify is Plaintiff's allegation that "MPD's EEO department did not take [Officer Rosario's] claim seriously" and "dismissed [it] in three days."  Compl. ¶ 50.  Certainly this does not establish a municipal policy.  Plaintiff also points to "long-standing customs at MPD," Pl.'s Opp'n at 6, but this conclusory language likewise does not establish a municipal policy.  Finally, Defendant seems to interpret Plaintiff's Complaint as arguing that the "'policy' of vesting the Chief of Police with [] discretion" was a basis of municipal liability.  Def.'s Mot. at 6.  While Plaintiff does criticize the vast discretion afforded the Chief of Police, the Court takes this to be a misinterpretation of Plaintiff's argument; it is not the vesting of discretion that is the "policy," but rather the Chief's actions that he takes with that discretion.

### 2. Causation

Next, a plaintiff must allege an "'affirmative link,' such that a municipal policy was the 'moving force' behind the constitutional violation." *Baker*, 326 F.3d at 1306 (citations omitted). The Court finds that Plaintiff has sufficiently alleged that the municipal policy was the moving force behind his allegedly discriminatory termination.

Defendant argues that Plaintiff does not "offer any facts at all about the decision maker on his termination sufficient to plausibly allege any connection." Def.'s Mot. at 7. However, Plaintiff alleges that Chief of Police Peter Newsham "was personally involved and the driving force behind [his] termination decision." Pl.'s Opp'n at 1, *see also id.* at 7. As the Complaint reads, Chief Newsham was personally involved throughout Plaintiff's disciplinary process: he referred Plaintiff to the trial board, despite the IAD's recommendation being not the normal consequence for the alleged offensive conduct; he had appointed that board and influenced them; and he accepted the board's decision, ultimately leading to Plaintiff's termination. Compl. ¶¶ 15–29, 40. Additionally, as Plaintiff explains, the fact that Officer Rosario filed a complaint regarding his disciplinary action against Chief Newsham, rather than someone else, demonstrates that the Chief was directly involved in such disciplinary decisions. *See* Pl.'s Opp'n at 7–8.

The Court finds that it "may be reasonably inferred" that there is "a link between" Plaintiff's termination and Chief Newsham's actions either directly participating in or endorsing disproportionately harsher discipline being given to Hispanic officers such as Plaintiff. *Brown v. Wilhelm*, 819 F. Supp. 2d 41, 44 (D.D.C. 2011) (BAH).

\*   \*   \*

In sum, the Court finds that Plaintiff has satisfactorily alleged a pervasive MPD policy or custom that was the moving force behind his termination.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's [27] Motion to Dismiss Count One of Plaintiff's Third Amended Complaint. An appropriate Order accompanies this Memorandum Opinion.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge